**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Newport News Division)**

| | |
|---|---|
| STACY WATSON, on behalf of herself and all others similarly situated, | CASE NO. _____ |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT** |
| LANGLEY FEDERAL CREDIT UNION, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendant. | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Stacy Watson ("Plaintiff"), individually and on behalf of all others similarly situated (collectively the "Class"), complains and alleges as follows based on personal knowledge as to herself, on the investigation of her counsel, and on information and belief as to all other matters:

<u>**INTRODUCTION**</u>

1.     This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant Langley FCU Bank ("Langley FCU"), arising from the unfair and unconscionable assessment and collection of "overdraft fees" ("OD Fees") on accounts that were never actually overdrawn.

2.     This practice breaches contract promises made in Langley FCU's adhesion contracts.

3.     In plain, clear, and simple language, the checking account contract documents discussing OD Fees promise that Langley FCU will <u>only</u> charge OD Fees or Non-Sufficient Funds Fees ("NSF Fees") on transactions where there are insufficient funds to cover them.

1

#

#

4.      As happened to Plaintiff, however, Langley FCU charges OD Fees even when there are sufficient funds to cover a debit card transaction.

5.      Langley FCU's customers have been injured by Langley FCU's improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with Langley FCU.

6.      On behalf of herself and the Class, Plaintiff seeks damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## JURISDICTION

7.      This Court has original jurisdiction over this putative class action lawsuit because it presents a federal question; because, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), the aggregate sum of the claims of the members of each of the putative classes exceeds $5 million, exclusive of interest and costs; because Plaintiff brings this action on behalf of a proposed class that is comprised of over one hundred members; and because at least one of the members of each of the proposed classes is a citizen of a different state than Langley FCU.  Further, this Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because this case poses a federal question: whether Defendant's conduct violates the Electronic Fund Transfers Act, 15 U.S.C. §§1693 *et seq*.

8.      Venue is proper in this District because Defendant maintains its headquarters here and because a substantial portion of events giving rise to this action occurred in this District.

## PARTIES

9.      Plaintiff Stacy Watson is a resident of Newport News, Virginia.

10.     Defendant Langley FCU is a $3 billion credit union headquartered in Newport News, Virginia. On information and belief, many account holders reside in surrounding states and the District of Columbia.

11.     Plaintiff is informed and believes, and thereupon alleges, that at least one of the members of the proposed class is a citizen of a state other than Virginia or is a citizen of the District of Columbia.  Langley FCU's website makes clear that individuals who reside outside of Virginia are welcomed to bank with Langley FCU.  Plaintiff is informed and believes, and thereupon alleges, that numerous individuals who reside outside of Virginia do in fact bank with Langley FCU, and that many of those non-Virginia-resident accountholders are members of the proposed class in this case.

12.     Even among accountholders who first opened a Langley FCU account while they lived in Virginia, many now reside outside of Virginia.  Virginia has experienced a prolonged period of out-migration.  Indeed, more people have moved out of Virginia than into Virginia for four straight years.[1]  Upon information and belief, at least one of those persons is a member of the putative class.

## FACTUAL ALLEGATIONS

13.     Plaintiff has a checking account with Langley FCU.

14.     Langley FCU issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

15.     Pursuant to its standard account agreement, Langley FCU charges fees for debit card transactions that purportedly result in an overdraft.

---

[1]     https://news.virginia.edu/content/out-migration-virginia-continues-fourth-consecutive-year

\#

\#

## I.   LANGLEY FCU CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

### A.   Overview of Claim

16.   Plaintiff brings this cause of action challenging Langley FCU's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

17.   Here is how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Langley FCU immediately reduces accountholders' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds to cover these transactions because Langley FCU has already sequestered these funds for payment.

18.   However, Langley FCU still assesses crippling OD Fees on many of these transactions, and misrepresents its practices in its account documents.

19.   Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Langley FCU later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

20.   Langley FCU maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Langley FCU sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds

are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

21.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

22.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

23.     Still, despite keeping those held funds off-limits for other transactions, Langley FCU improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

24.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because

#

#

of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

25.     There is no justification for these practices, other than to maximize Langley FCU's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Langley FCU is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Langley FCU was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

26.     Besides being unfair and unjust, these practices breach contract promises made in Langley FCU's adhesion contracts—contracts which fail to inform accountholders about the true

#

#

nature of Langley FCU's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

27.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that Langley FCU will only charge OD Fees on transactions that have insufficient funds to cover that debit card transaction.

28.     In short, Langley FCU is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.     Mechanics of a Debit Card Transaction**

29.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Langley FCU. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Langley FCU, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

30.     At this step, if the transaction is approved, Langley FCU immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

31.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

#

#

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

32.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

33.     Langley FCU (like all banks) decides whether to "pay" debit card transactions at authorization.  After that, the Bank is obligated to pay the transaction no matter what.  For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when the Bank may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

34.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

C.     **Langley FCU's Account Contract**

35.     Plaintiff has a Langley FCU checking account, which is governed by Langley FCU's standardized Overdraft Disclosure, Ex. A.  That document states:

**WHAT YOU NEED TO KNOW ABOUT OVERDRAFTS AND OVERDRAFT FEES**

An overdraft occurs when your account's "available balance" (which is described in your Membership and Account Agreement) is not sufficient to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:

1.   We have <u>standard overdraft practices</u> that come with your account.

#

#

2. We also offer <u>overdraft protection plans</u>, such as a link to a share/savings account or overdraft line-of-credit, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our <u>standard overdraft practices</u>.

**What are the <u>standard overdraft practices</u> that come with my account?**

We <u>do</u> authorize and pay overdrafts for the following types of transactions:
• Share drafts/checks, and other transactions made using your checking account
• Automatic bill payments
• ACH transactions

We <u>do not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
• ATM transactions
• One-time debit card transactions

We pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction.

If we <u>do not</u> authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if the Credit Union pays my overdraft?**

Under our <u>standard overdraft practices</u>:
• We will charge you a fee of $<u> 30 </u>each time we pay an ATM or debit card transaction overdraft.
• There is <u>no limit</u> on the total fees we can charge you for overdrawing your account.

**What if I want the Credit Union to authorize and pay overdrafts on my ATM and one-time debit card transactions?**

If you want us to authorize and pay overdrafts on ATM and one-time debit card transactions, complete the section below and mail it to:<u> Langley Federal Credit Union PO Box 120128 Newport News, VA 23612 </u>or call<u> (800) 826-7490 </u>.

36.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Langley FCU assesses OD Fees on them anyway.

37.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN

Transactions. APPSN transactions are always authorized at the time the customer swipes the debit card when there are sufficient available funds in the account.

38.     In fact, Langley FCU actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

39.     All the above representations and contractual promises are untrue. In fact, Langley FCU charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Langley FCU may impose OD Fees on any APPSN Transactions.

40.     The account documents misconstrue Langley FCU's true debit card processing and overdraft practices.

41.     First, and most fundamentally, Langley FCU charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that Langley FCU will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

42.     Langley FCU assesses OD Fees on APPSN Transactions that ***do*** have sufficient funds available to cover them throughout their lifecycle.

43.     Langley FCU's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Langley FCU's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

44.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

#

#

45.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Langley FCU does when it re-debits the account during a secret batch posting process.

46.     In reality, Langley FCU's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

47.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Langley FCU cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

48.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Langley FCU does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, Langley FCU releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

49.     This secret step allows Langley FCU to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which Langley FCU specifically set aside money to pay them.

50.     This discrepancy between Langley FCU's actual practices and the contract causes accountholders to incur more OD Fees than they should.

51.     In sum, there is a huge gap between Langley FCU's practices as described in the account documents and Langley FCU's practices in reality.

    **D.**     **Langley FCU Abuses Contractual Discretion**

52.     Langley FCU's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, Langley FCU exploits contractual discretion to the detriment of accountholders when it uses these policies.

53.     The term "hold" is interpreted by Langley FCU in a surprising, counterintuitive way. Langley FCU uses its discretion to define this term in a manner contrary to any reasonable, common sense understanding of that term.

54.     Moreover, Langley FCU uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

55.     Langley FCU uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

**E.     Plaintiff's Debit Card Transactions**

56.     As examples, on December 11, 2019, and August 20, 2019, Plaintiff was assessed OD Fees in the amount of $30.00 each for debit card transactions that settled on those days, despite the fact that positive funds were immediately deducted prior to those days, when the transactions were authorized.

**III.     CLASS ACTION ALLEGATIONS**

57.     Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23. The Class is defined as:

> All consumers who, within the applicable statute of limitations preceding the filing of this lawsuit, were charged OD Fees on APPSN Transactions on their Langley FCU Bank account.

58.     Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which Defendant

has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

59.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

60.     The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because Langley FCU has acted on grounds generally applicable to the class.  Such common legal or factual questions include, but are not limited to:

      a)  Whether Langley FCU improperly charged OD Fees on APPSN Transactions;
      b)  Whether the conduct enumerated above violates the contract;
      c)  Whether the conduct enumerated above violates the covenant of good faith and fair dealing;
      d)  Whether the conduct enumerated above violates the Electronic Fund Transfers Act; and
      e)  The appropriate measure of damages.

61.     The parties are numerous such that joinder is impracticable.  Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Langley FCU's records.  Langley FCU has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

62.     It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their

common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.  The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

63.     Plaintiff's claims are typical of the claims of the other members of the Class in that they arise out of the same wrongful business practices by Langley FCU, as described herein.

64.     Plaintiff is more than an adequate representative of the Classes in that Plaintiff has suffered damages as a result of Langley FCU's contract violations.  In addition:

   a) Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions;
   b) There is no conflict of interest between Plaintiff and the unnamed members of the Class;
   c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

65.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

66.     Langley FCU has acted or refused to act on grounds generally applicable to the class, thereby making appropriate corresponding declaratory relief with respect to the Class as a whole.

67.     All conditions precedent to bringing this action have been satisfied and/or waived.

#

#

**BREACH OF CONTRACT INCLUDING THE
COVENANT OF GOOD FAITH AND FAIR DEALING
(Individually and on Behalf of the Class)**

68.     Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth herein.

69.     Plaintiff, and all members of the proposed Class contracted with Langley FCU for checking account services, including debit card services.

70.     Langley FCU breached promises made to Plaintiff and all members of the proposed class when, as described herein, Langley FCU charged OD Fees as a result of transactions that did not overdraw a checking account, on APPSN Transactions.

71.     In addition, under Virginia law, there exists an implied covenant of good faith and fair dealing in all contracts that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

72.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

73.     The implied covenant of good faith and fair dealing applies to the performance and enforcement of contracts, limits the parties' conduct when their contract defers decision on a particular term, omits terms, or provides ambiguous terms.

#

#

74.     Langley FCU has breached the covenant of good faith and fair dealing and abused its discretion in its contract as described herein.  Specifically, Langley FCU should not have used its discretion to charge OD Fees on APPSN Transactions.

75.     Plaintiff and all members of the proposed Class have performed all, or substantially all, of the obligations imposed on them under the contract.

76.     Plaintiff and all members of the proposed Class have sustained damages as a result of Langley FCU's breach of the contract.

**VIOLATION OF ELECTRONIC FUND TRANSFERS ACT (REGULATION E)
C.F.R. § 1005 ET SEQ. (AUTHORITY DERIVED FROM 15 U.S.C. § 1693 *ET SEQ*.)
(On Behalf of Plaintiff and the Ledger Balance Class)**

77.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein. By charging overdraft fees on ATM and nonrecurring transactions, Langley FCU violated Regulation E (12 C.F.R. §§1005 et seq.), the "primary objective" of which is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act, 15 U.S.C. §§1693 et seq., the "EFTA"] (§1005. l(b)), for which the express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

78.     Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p ]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (*Id.*) The notice "shall be clear and readily understandable."  (12 C.F.R. §205.4(a)(l).) To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12

#

#

C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

79.     The intent and purpose of this Opt-In Contract is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way," as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank* (*USA*), 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z).

80.     Langley FCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions. Langley FCU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17.  Langley FCU's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because Langley FCU misrepresents when it assesses OD Fees, as described above.

81.     As exhibited by the transactions above, Plaintiff's account had funds to cover the transactions, which were paid, yet Langley FCU charged overdraft fees.

82.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so, Langley FCU has harmed Plaintiff and the Class. Due to Langley FCU's violation of

\#

\#

Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A.  Certification for this matter to proceed as a class action on behalf of the Class;

B.  Declaring Langley FCU's OD Fee policies and practices to be in breach of its contract with accountholders;

C.  Restitution of all OD Fees paid to Langley FCU by Plaintiff and the members of the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

D.  Actual damages in an amount according to proof;

E.  Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

F.  For costs and attorneys' fees under applicable law; and

G.  Such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of herself and the Class, hereby demands a trial by jury on all claims so triable.

Dated: June 26, 2020

Respectfully submitted,

_____/s/ Bernard J. DiMuro_____
Bernard J. DiMuro, Esq. (VSB No. 18784)
Jayna Genti, Esq. (VSB No. 90065)
**DIMUROGINSBERG, P.C.**
1101 King Street, Suite 610
Alexandria, Virginia 22314
Tel: (703) 684-4333
Fax: (703) 548-3181
Email: bdimuro@dimuro.com
          jgenti@dimuro.com

Jeffrey Kaliel (*pro hac vice* to be filed)
Sophia Gold (*pro hac vice* to be filed)
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
Tel: (202) 350-4783
Email: jkaliel@kalielpllc.com
          sgold@kalielpllc.com

*Counsel for Plaintiff and the Class*